# 23-0658-cv

In the United States Court of Appeals
for the Second Circuit
_____

PATRICIA OLIVIERI,
*Plaintiff-Appellee,*

v.

STIFEL, NICOLAUS & COMPANY, INCORPORATED, NEIL ISLER and
ROBERT CODIGNOTTO, in their individual and professional capacities,
*Defendants-Appellants,*

CHRISTINA SCELTA, in her individual and professional capacity,
JULIE GAFFNEY, in her individual and professional capacity,
*Defendants.*
_____

On Appeal from the United States District Court
for the Eastern District of New York
_____

**BRIEF OF AMICI CURIAE PUBLIC JUSTICE, AMERICAN ASSOCIATION FOR
JUSTICE, AND THE NEW YORK CHAPTER OF THE NATIONAL EMPLOYMENT
LAWYERS ASSOCIATION IN SUPPORT OF PLAINTIFF-APPELLEE**
_____

Ellen Noble
PUBLIC JUSTICE
1620 L St. NW, Ste. 630
Washington, DC 20036
Tel: (240)-620-3645
Fax: (202) 232-7203
ENoble@publicjustice.net

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
Tel: (202) 617-5620
Jeffrey.White@justice.org

*Counsel for Amici Curiae*

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, amici curiae Public Justice, American Association for Justice, and National Employment Lawyers Association-New York are all non-profit entities that have no parent corporation. No publicly held corporation holds 10% or more of any stake or stock in amici curiae.


Dated: November 7, 2023

/s/ Ellen Noble
Ellen Noble
*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

Interest of Amici Curiae ............................................................................... 1

Introduction ................................................................................................... 2

Argument ....................................................................................................... 4

    I.   The Act applies because Ms. Olivieri's claims continued to accrue after the Act went into effect. .................................................................................................. 4

   II.  Defendants cannot evade the plain language of the Act. .................... 6

  III.  This case does not require any "retroactive" application of the Act................................. 9

  IV.  Defendants' approach undermines the public policy embodied by the Act, leaving workers vulnerable to ongoing abuse. ........................... 11

Conclusion ................................................................................................... 14

Certificate of Compliance ........................................................................... 15

Certificate of Service .................................................................................. 15

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abhyankar v. Countrywide Fin. Corp.*,
  2013 WL 1494457 (ARB Mar. 29, 2013) ..............................................................11

*Amaya v. Ballyshear LLC*,
  295 F. Supp. 3d 204 (E.D.N.Y. 2018) ....................................................................5

*Berlin v. Jetblue Airways Corp.*,
  436 F. Supp. 3d 550 (E.D.N.Y. 2020) ....................................................................5

*Boland v. State*,
  284 N.E.2d 569 (N.Y. 1972) ..................................................................................5

*Centifanti v. Nix*,
  865 F.2d 1422 (3d Cir. 1989) .................................................................................4

*Dimitracopoulos v. City of New York*,
  26 F. Supp. 3d 200 (E.D.N.Y. 2014) ..................................................................5, 6

*Espin v. Citibank, N.A.*,
  2023 WL 6449909 (E.D.N.C. Sept. 29, 2023) ......................................................10

*Gonzalez v. Hasty*,
  802 F.3d 212 (2d Cir. 2015) ................................................................................4, 8

*Hoery v. United States*,
  324 F.3d 1220 (10th Cir. 2003) ..............................................................................4

*Kelly v. Stello*,
  1993 WL 152240 (5th Cir. Apr. 19, 1993) (per curiam) ........................................5

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994) .........................................................................................9, 10

*Leonhard v. United States*,
  633 F.2d 599 (2d Cir. 1980) ...................................................................................8

*Lysik v. Citibank, N.A.*,
  2017 WL 4164037 (N.D. Ill. Sept. 20, 2017) .......................................................10

*McDonough v. Smith*,
  139 S. Ct. 2149 (2019) ...........................................................................................4

*Molzof v. United States*,
  502 U.S. 301 (1992) ............................................................................7

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ............................................................................5

*Next Millenium Realty, LLC v. Adchem Corp.*,
  690 F. App'x 710 (2d Cir. 2017) .......................................................13

*Page v. United States*,
  729 F.2d 818 (D.C. Cir. 1984) .............................................................4

*Pezza v. Investors Capital Corp.*,
  767 F. Supp. 2d 225 (D. Mass. 2011) ................................................11

*Town of Huntington v. Cnty. of Suffolk*,
  910 N.Y.S.2d 454 (N.Y. App. Div. 2010) ...........................................5

*United States v. Lindsay*,
  346 U.S. 568 (1954) .........................................................................8, 9

*Washington v. Cnty. of Rockland*,
  373 F.3d 310 (2d Cir. 2004) .................................................................5

*Wong v. CKX, Inc.*,
  890 F. Supp. 2d 411 (S.D.N.Y. 2012) ...............................................11

**Statutes**

9 U.S.C. § 401 ....................................................................................2

9 U.S.C. § 402 ...............................................................................2, 13

14 U.S.C. § 937 ..................................................................................9

24 U.S.C. § 225g .................................................................................9

28 U.S.C. § 2501 ................................................................................9

28 U.S.C. § 2679 ................................................................................9

43 U.S.C. § 641a ................................................................................9

45 U.S.C. § 1203 ................................................................................9

Civil Rights Act of 1964, Title VII ...............................................4, 5, 6

New York State Human Rights Law ................................................3, 6

iv

The Ending Forced Arbtiration of Sexual Harassment and Sexual Assault Act,
Pub. L. No. 117-90, 136 Stat 26 (2022).........................................................................*passim*

**Other Authorities**

Alexander J.S. Colvin, Econ. Policy Inst., *The Growing Use of Mandatory
Arbitration* (2018) ..........................................................................................................11

H.R. Rep. No. 117-234 (2022)...................................................................................11, 12

Kate Hamaji et al., Ctr. for Pop. Dem., Econ. Pol'y Inst., *Unchecked Corporate
Power: Forced Arbitration, the Enforcement Crisis, and How Workers Are
Fighting Back* 1 (2019) .................................................................................................12

Terri Gerstein, *Forced Arbitration is Unjust and Deeply Unpopular. Can
Congress End It?*, Slate (Mar. 1, 2019) .....................................................................12

## INTEREST OF AMICI CURIAE[1]

Amici are nonprofit organizations committed to ensuring access to justice. Public Justice is a national public interest advocacy organization that fights against abusive corporate power and predatory practices, the assault on civil rights and liberties, and the destruction of the earth's sustainability. The organization maintains an Access to Justice Project that pursues high-impact litigation and advocacy efforts to remove procedural obstacles that unduly restrict the ability of workers, consumers, and people whose civil rights have been violated to seek redress in the civil court system. Towards that end, Public Justice has a longstanding practice of fighting against the unlawful use of mandatory arbitration clauses that deny workers their day in court. Indeed, last year Public Justice won a unanimous Supreme Court victory in *Morgan v. Sundance*, 142 S. Ct. 1708 (2022), in which Taco Bell workers challenged the enforcement of a mandatory arbitration agreement.

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ's members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. Throughout its more than 75-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.

NELA/NY is the approximately 350-member New York chapter of The National Employment Lawyers Association (NELA), the nation's only professional bar organization

---

[1] No counsel for a party authored this brief in whole or in part, and no person other than amici or their counsel has made any monetary contributions intended to fund the preparation or submission of this brief. All parties have consented to the filing of this amicus brief.

comprised exclusively of lawyers who represent individual employees. Through its various activities, including amicus work, NELA/NY promotes effective legal protections for employees and offers a perspective on the impact of laws and regulations on working people and the workplace relationship.

Given Public Justice, AAJ, and NELA/NY's commitment to protecting workers' access to justice, they share a strong interest in the proper interpretation and application of the new Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2022, which provides survivors with access to courts and promotes public accountability.

## INTRODUCTION

On March 3, 2022, President Biden signed into law the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("the Act"), Pub. L. No. 117-90, 136 Stat. 26, 9 U.S.C. §§ 401-402. The law, passed with bipartisan support, gives victims of sexual assault or sexual harassment the right to pursue their claims in court instead of being forced into secretive, unfair arbitration procedures. Specifically, the law says that "no predispute arbitration agreement . . . shall be valid or enforceable with respect to a case which . . . relates to [a] sexual assault dispute or [a] sexual harassment dispute." 9 U.S.C. § 402(a). The new law, heralded as "one of the most significant workplace reforms in the last 50 years," ensures that survivors have access to justice and that employers cannot continue to sweep sexual misconduct under the rug.[2]

The question at issue in this appeal is whether the Act applies to cases filed before the Act went into effect, but where the employer's wrongful conduct continues after the Act went

---

[2] Press Release, Sen. Kirsten Gillibrand, Gillibrand, Graham Celebrate Senate Passage Of Landmark Bill To Void And Prevent Forced Arbitration Agreements For Sexual Harassment And Sexual Assault (Feb. 10, 2022), https://www.gillibrand.senate.gov/news/press/release/gillibrand-graham-celebrate-senate-passage-of-landmark-bill-to-void-and-prevent-forced-arbitration-agreements-for-sexual-harassment-and-sexual-assault.

into effect. The answer is in the plain meaning of the statute's text. Section 3 of the Act states that the Act shall apply to any dispute or claim that "arises or accrues" on or after the Act went into effect on March 3, 2022, and it is well established that continuing violations of Title VII or the New York State Human Rights Law (NYSHRL) continue to "accrue" so long as the wrongful, tortious conduct continues. Because Ms. Olivieri has alleged that she continued to be subject to hostile and retaliatory conduct in violation of Title VII and the NYSHRL *after* March 3, 2022, the new law applies.

Defendants cannot avoid the centuries-old case law explaining that claims continue to "accrue" when there is a continuous violation. When Congress uses a term of art rooted in legal tradition, as it did here, courts must assume that Congress intended for the legal meaning of the term, and accompanying legal principles, to apply. There is nothing absurd or contradictory about the longstanding meaning of "accrued" adopted by the district court, and if Congress had wanted the Act to apply only to claims that *first* accrued after March 3, it could have said so—as it has done in other statutes. Furthermore, contrary to defendants' arguments, this case does not require any retroactive application of the Act. Ms. Olivieri's claim accrued after the Act went into effect, defendants continued to harass her after the Act went into effect, and the Act governs conduct—the enforcement of a predispute arbitration agreement—that postdates the Act.

Beyond the text, defendants' overly narrow interpretation of "arises or accrues" undermines the public policy embodied by the Act. Congress passed the Act to bring sexual misconduct and related claims into the open, recognizing that unsafe work environments and discriminatory practices can go undetected for years when employees are forced into secretive arbitration proceedings. Defendants' approach would keep many of those cases in the dark, even when the plaintiff is alleging ongoing and continuous hostility and harassment that post-dates the

3

Act. Thus, according to both the plain text and purpose of the Act, defendants should not be permitted to force Ms. Olivieri to arbitrate her case.

## ARGUMENT

### I. The Act applies because Ms. Olivieri's claims continued to accrue after the Act went into effect.

The Act applies because, even though Ms. Olivieri filed suit before the Act went into effect, her claims continued to accrue *after* the Act went into effect. Section 3 of the Act states: "This Act, and the amendments made by this Act, shall apply with respect to any dispute or claim that arises or accrues on or after the date of enactment of this Act." Pub. L. No. 117-90, § 3, 136 Stat 26, 28 (2022). The language "arises or accrues" is a specific legal term of art that encompasses longstanding common-law principles. *See McDonough v. Smith*, 139 S. Ct. 2149, 2156 (2019).

For federal causes of action, like Ms. Olivieri's Title VII claims, "the time at which [the] claim accrues is a question of federal law, conforming in general to common-law tort principles." *Id.* at 2155. Under federal law, "[i]t is well-settled that [w]hen a tort involves continuing injury, the cause of action accrues . . . at the time the tortious conduct ceases." *Page v. United States*, 729 F.2d 818, 821 (D.C. Cir. 1984) (citing cases); *see also Hoery v. United States*, 324 F.3d 1220, 1222 (10th Cir. 2003) (explaining that "for continuing torts . . . the claim continues to accrue as long as tortious conduct continues"); *Centifanti v. Nix*, 865 F.2d 1422, 1433 (3d Cir. 1989) (observing that plaintiff's "action continues to accrue on each day of the alleged wrong").

Such a continuing violation under federal law "typically arises in the context of a complaint of unlawful workplace discrimination challenged under Title VII of the Civil Rights Act of 1964." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015). Under Title VII, there is a continuing violation "if a plaintiff has experienced a continuous practice and policy of

4

discrimination." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 317 (2d Cir. 2004). The Supreme Court has specifically recognized that a hostile work environment claim may be a continuing violation because "[i]t occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002). It is "composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 111. Thus, a hostile work environment claim continues to accrue so long as the wrongful acts contributing to the claim continue to occur. *See Amaya v. Ballyshear LLC*, 295 F. Supp. 3d 204, 218 (E.D.N.Y. 2018) (citing *Morgan*, 536 U.S. at 117).

For state law claims, like Ms. Olivieri's NYSHRL claims, "state law determines when [the] cause of action accrues." *Kelly v. Stello*, No. 92-7662, 1993 WL 152240, at *1 (5th Cir. Apr. 19, 1993) (per curiam); *see also Berlin v. Jetblue Airways Corp.*, 436 F. Supp. 3d 550, 566 (E.D.N.Y. 2020) (applying state law accrual rules to state law claims). Like federal causes of action, a cause of action under New York law continues to accrue if the wrongful acts are continuous. *See Boland v. State*, 284 N.E.2d 569, 571 (N.Y. 1972) (citing 19 Carmody-Wait, 2d, Actions in the Court of Claims, § 120.17, at pp. 746-747) ("where wrongful acts are continuous, a new cause of action accrues each day upon the commission of each new wrong")); *see also Town of Huntington v. Cnty. of Suffolk*, 910 N.Y.S.2d 454, 461 (N.Y. App. Div. 2010) (same).

The continuous violations doctrine is even broader under New York law than it is under federal law. "New York courts have held that the pre-*Morgan*, more generous continuing violations doctrine continues to apply to *discrete* acts of employment discrimination under NYCHRL." *Dimitracopoulos v. City of New York*, 26 F. Supp. 3d 200, 212 (E.D.N.Y. 2014) (emphasis added). A continuing violation may be found as a matter of state law "where specific

5

and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Id.* (quoting *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001)). Thus, even if there is a series of discrete incidents which may be independently actionable, if the incidents are related and together amount to a discriminatory policy or practice, then there is a continuing violation and the plaintiff's claims will continue to accrue until the discriminatory policy or practice stops.

Under the governing federal and state law claim accrual standards, Ms. Olivieri's Title VII and NYSHRL claims continued to accrue after the Act went into effect on March 3, 2022. Ms. Olivieri originally alleged that she "continues to work in a hostile work environment where she feels unsafe," JA62, ¶ 146, and then amended the complaint with extensive, specific allegations of ongoing wrongful harassment and retaliation that took place *after* the Act went into effect and that are closely related to the pre-Act instances of discrimination, *see* JA274-JA292. Because Ms. Olivieri has adequately alleged that her Title VII and NYSHRL claims continued to accrue after the Act went into effect, the Act applies and the predispute arbitration agreement is unenforceable.

**II.      Defendants cannot evade the plain language of the Act.**

Defendants cannot ignore the fact that Congress, in defining the applicability of the Act, used a centuries-old legal term of art with a well-settled meaning. Congress stated that the Act applies to any dispute or claim that "arises or accrues" after March 3, 2022. Yet defendants claim that the entire body of case law concerning when a claim "arises or accrues" in the statute of limitations context is inapplicable, and suggests that the term means something entirely different in this context. *See* Appellant's Br. at 15-16.

Defendants' argument violates a cardinal rule of statutory construction. The Supreme Court has repeatedly explained that:

6

> [W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed. In such case, absence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them.

*Molzof v. United States*, 502 U.S. 301, 307 (1992) (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952)). Thus, when Congress chose to use the term "arises or accrues," Congress intended for courts to rely on the centuries of case law, mostly in the statute of limitations context, that define the term. Indeed, defendants' own proffered definition—that a claim "accrues when the plaintiff *has a right to commence it*" or when "the plaintiff *can file suit* and obtain relief"—necessarily begs the question of whether the claim is timely, which the term of art, as interpreted in the statute of limitations context, directly addresses. *See* Appellant's Br. at 12-13 (emphasis added).

It makes sense that Congress, in enacting the Act, would want courts to rely on case law addressing when a claim "arises or accrues" in the statute of limitations context. In that context, the term is used to define the temporal scope of claims subject to the statute, and the term is used for the very same purpose in the Act. By directing courts to an existing body of law, Congress can create a more predictable statutory scheme and minimize litigation. That is precisely what Congress did here. Instead of having courts reinvent the wheel, it directed courts to apply well-established principles that govern when claims "arise or accrue." If this Court departs from those common-law principles, including the continuing violations doctrine, it will not only usurp Congress' lawmaking authority, but it will create confusion and unnecessary litigation as parties try to relitigate hundreds of years of case law that govern when a claim arises or accrues.

Defendants contend that the district court and appellant are embracing multiple contradictory meanings of the term by suggesting a claim can accrue both when a cause of action first exists and also when the last wrongful act of a continuing wrong takes place. But there is nothing contradictory or absurd about this approach: it's how courts have interpreted the term for centuries. "The cluster of ideas" attached to the centuries-old legal term includes "the *continuing* violation doctrine," which, "where applicable, provides an '*exception* to the normal knew-or-should-have-known accrual date.'" *Gonzalez*, 802 F.3d at 220 (2d Cir. 2015) (quoting *Harris v. City of New York*, 186 F.3d 243, 248 (2d Cir. 1999)) (emphasis added); *see also Leonhard v. United States*, 633 F.2d 599, 613 (2d Cir. 1980) (explaining that the general accrual rule "is subject to the modification that a claim to redress a continuing wrong will be deemed to have accrued on the date of the last wrongful act"). Defendants cannot distort the law in their favor and ignore the well-settled principle that when an action "accrues" depends on whether or not the wrongful conduct is continuous. If defendants were to state the accrual rule for non-continuous violations, without acknowledging the accrual rule for continuous violations, they would simply be misstating the law of when a claim "arises or accrues."

Defendants try to evade the centuries of case law interpreting the term "arises or accrues" by relying on the Supreme Court's decision in *United States v. Lindsay*, 346 U.S. 568, 570 (1954) for the proposition that the term "arise" has no settled meaning. But *Lindsay* says no such thing. In *Lindsay*, the Government asked the Court to deviate from "the normal meaning of 'accrued'" to avoid retroactive barring of suits. *Id.* at 569-70. The Government argued that the Court should interpret "'six years after the right accrued' as though Congress intended to say 'six years after the effective date of the Act when it is applied to pre-existing causes of action.'" *Id.* The Court refused to assume Congress intended the term accrued to have this "special meaning,"

noting that the prior courts that had interpreted "accrued" in this way only did so to avoid constitutional concerns that were not at issue here. *Id.* at 570. *Lindsay* did not involve a continuing wrong and thus the Court never addressed the meaning of "accrue" in that context. Thus, *Lindsay* does not support defendants' position and, if anything, reaffirms that courts will apply the plain text of the statute even if doing so may have some retroactive effect.

Finally, if Congress had wanted the Act to apply only to claims that *first* accrued after March 3, 2022, it would have said so. Indeed, it has said so before. *See* 28 U.S.C. § 2501 (providing that the Court of Claims has jurisdiction over claims filed "within six years after the claim *first* accrues") (emphasis added). Congress has also referred to claims that accrued *prior to* or *before* a specific date. *See, e.g.*, 43 U.S.C. § 641a; 28 U.S.C. § 2679; 14 U.S.C. § 937; 24 U.S.C. § 225g; 45 U.S.C. § 1203. Congress understands that some actions continue to accrue over time and knows how to write a statute to exclude all claims that first accrued before a certain date. But in this statute, Congress stated that the Act applied to any dispute or claim arising or accruing after March 3, 2022, thereby ensuring that the Act applies to claims, like Ms. Olivieri's, that continued to accrue after that date.

### III. This case does not require any "retroactive" application of the Act.

Contrary to defendants' argument, applying a new law to a pending case is not a "retroactive" application of the law. As the Supreme Court has explained, "[a] statute does not operate retrospectively merely because it is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 269 (1994). The Act, as applied here, restricts conduct—specifically, defendants' enforcement of a predispute arbitration agreement—that took place *after* the Act went into effect. Moreover, the Act only applies in this case because defendants continued to engage in wrongful conduct *after* the Act went into effect. But even if defendants want to characterize this

9

application of the Act as "retroactive," contrary to Supreme Court authority, such application of the law would still be permissible because it is mandated by the statute's text. *See id.* at 272 (explaining statutes will be construed to have retroactive effect if "their language requires this result").

Further, even if this case did involve a retroactive application of the statute (which it doesn't) *and* the statutory text did not dictate the temporal reach of the statute (which it does), the district court was also right in holding that application of the statute would not be impermissibly retroactive. Defendants cite a series of district court cases holding that retroactive application of restrictions on the right to arbitrate interferes with the parties' substantive right to contract. *See* Appellant's Br. at 25. But first, those cases deal with different statutes that, unlike the Act here, do not specifically define the temporal reach of the Act. Second, there is no dispute that the Act applies, precluding arbitration, where arbitration agreements were formed before March 2022, but the claim accrued after March 2022, so the parties "right to contract" as characterized by defendant is curtailed regardless of the definition of accrual. Congress was clearly not concerned with that alleged "retroactive" effect of the Act.

Third and finally, many district courts—including the court below—have held that retroactive application of statutes that restrict the enforcement of arbitration agreements is permissible because such statutes do not interfere with the parties' substantive rights. *See Espin v. Citibank, N.A.*, No. 5:22-CV-383-BO-RN, 2023 WL 6449909, at *3 (E.D.N.C. Sept. 29, 2023) (holding Servicemembers Civil Relief Act's restriction on the enforceability of agreements requiring individual arbitration was akin to "a jurisdiction-conferring or jurisdiction-stripping statute" that "takes away no substantive right but simply changes the tribunal that is to hear the case and thus may be applied retroactively"); *Lysik v. Citibank, N.A.*, No. 17-cv-2277, 2017 WL

4164037, at *4 (N.D. Ill. Sept. 20, 2017) (holding that arbitration restriction in Consumer Financial Protection Act applies to pre-CFPA arbitration agreement); *Wong v. CKX, Inc.*, 890 F. Supp. 2d 411 (S.D.N.Y. 2012) (holding that Dodd-Frank prohibition on pre-dispute agreements to arbitrate whistleblower claims applies to pre-Dodd-Frank arbitration agreement); *Pezza v. Investors Capital Corp.*, 767 F. Supp. 2d 225 (D. Mass. 2011) (same); *see also Abhyankar v. Countrywide Fin. Corp.*, ARB No. 11-043, 2013 WL 1494457, at *5 (ARB Mar. 29, 2013) (holding that the Dodd-Frank arbitration ban for whistleblower claims applies retroactively).

## IV. Defendants' approach undermines the public policy embodied by the Act, leaving workers vulnerable to ongoing abuse.

Defendants' unsupported interpretation of Section 3 is not only inconsistent with the text, but it also thwarts the public policy behind the new law. As Senator Richard Durbin explained, "[t]he premise of this legislation is simple: Survivors of sexual assault or harassment . . . should be able to choose whether to bring a case forward, instead of being forced into a secret arbitration proceeding where the deck is stacked against them." Cong. Rec. S626 (daily ed. Feb. 10, 2022). Today, more than 50% of nonunion, private-sector employees are subject to mandatory arbitration agreements, barring them from raising claims of any kind in court.[3] And that number is likely to rise to 80% by 2024.[4]

Congress prohibited the enforcement of mandatory arbitration agreements in cases related to sexual harassment or sexual assault to "restore access to justice for millions of victims of sexual assault or harassment who are currently locked out of the court system and are forced to settle their disputes against companies in a private system of arbitration that often favors the

---

[3] Alexander J.S. Colvin, Econ. Policy Inst., *The Growing Use of Mandatory Arbitration* (2018), https://www.epi.org/publication/the-growing-use-of-mandatory-arbitration-access-to-the-courts-is-now-barred-for-more-than-60-million-american-workers/.

company over the individual." H.R. Rep. No. 117-234, at 4 (2022). "Because arbitration lacks the transparency and precedential guidance of the justice system, there is no guarantee that the relevant law will be applied to these disputes or that fundamental notions of fairness and equity will be upheld in the process." *Id.* at 3. Additionally, "the purportedly neutral arbitrator may be motivated by the prospect of obtaining repeat business from the company rather than the desire to fairly assess the claim." *Id.* at 5 (citing Carrie Menkel-Meadow, *Do the "Haves" Come Out Ahead in Alternative Judicial Systems?: Repeat Players in ADR*, 15 Ohio St. J. on Disp. Resol. 19, 35-37 (1999)).

Congress, in enacting the law, also recognized that the "secretive nature" of forced arbitration is particularly pernicious in the context of sexual harassment claims because it "prevents victims from sharing their stories." H.R. Rep. No. 117-234, at 4. "This allows for the growth of office cultures that ignore harassment and retaliate against those who report it, prevent future victims from being warned about dangerous companies and individuals, and create incentives for the corporate protection of rapists and other serial harassers." *Id.* As the bipartisan group of attorneys general stressed in their plea for legislative reform, "[e]nding mandatory arbitration of sexual harassment claims would help to put a stop to the culture of silence that protects perpetrators at the cost of their victims." *Id.* at 11. The secretive nature of arbitration "has allowed outrageous violations, in some cases years of sexual harassment and predation, to remain hidden from view and therefore to continue."[5] But with the Act's enactment, "the days of

---

[4] Kate Hamaji et al., Ctr. for Pop. Dem., Econ. Pol'y Inst., *Unchecked Corporate Power: Forced Arbitration, the Enforcement Crisis, and How Workers Are Fighting Back* 1 (2019), https://www.epi.org/publication/unchecked-corporate-power/.

[5] Terri Gerstein, *Forced Arbitration is Unjust and Deeply Unpopular. Can Congress End It?*, Slate (Mar. 1, 2019), https://slate.com/news-and-politics/2019/03/congress-forced-arbitration-fair-act.html.

taking sexual harassment . . . claims and burying them in the basement of arbitration are over." Cong. Rec. S628 (daily ed. Feb. 10, 2022) (statement of Sen. Lindsey Graham).

Defendants' interpretation of "accrues" undercuts the strong and explicit public policy embodied by the Act. The Act confirms that forced arbitration clauses in the context of sexual misconduct are not just unfair, but dangerous, because they are used to conceal and enable ongoing sexual harassment and assault. Contrary to the Act's purpose of casting a light on sexual harassment, assault, and other related wrongful conduct, defendants seek to flip the Act on its head by giving any employer that was already engaging in such discriminatory policies or practices before the enactment date a free pass to *continue* to evade public accountability. Defendants should not be permitted to silence Ms. Olivieri and deny her access to court as they continue to discriminate against her through ongoing harassment and retaliation.

Nor does it matter that much of the sexual harassment pre-dates the Act when the hostile environment and retaliation has continued after the Act went into effect. Contrary to defendants' argument, Congress was not merely concerned with ensuring that sexual harassment and assault claims are heard in court. *See* Appellant's Br. at 27-28. Congress wrote the law to ensure any case that "relates to" sexual harassment or assault disputes is heard in court, recognizing that these harms often take place in a larger context of an ongoing hostile work environment and that plaintiffs are often silenced through retaliatory conduct, *see* 9 U.S.C. § 402(a). "As a remedial statute," the Act "should be construed liberally to give effect to its purposes." *Next Millenium Realty, LLC v. Adchem Corp.*, 690 F. App'x 710, 714 (2d Cir. 2017).

**CONCLUSION**

For the reasons above, this Court should affirm the decision below and hold that defendants cannot compel arbitration of Ms. Olivieri's claims because her claims continued to accrue *after* the Act went into effect.


Dated: November 7, 2023

                           Respectfully submitted,

                           /s/ Ellen Noble
Ellen Noble
PUBLIC JUSTICE
1620 L Street, NW, Suite 630
Washington, D.C. 20036
(240) 620-3645
ENoble@publicjustice.net

Jeffrey R. White
AMERICAN ASSOCIATION FOR JUSTICE
777 6th Street, NW #200
Washington, DC 20001
(202) 617-5620
Jeffrey.White@justice.org


*Counsel for Amici Curiae*

14

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and Local Rules 29.1 and 32.1(4), I certify that the foregoing brief is proportionately spaced using 12-point Times New Roman font and contains 4,281 words, excluding the parts exempted from length limits by Federal Rule 32(f).

/s/ Ellen Noble
Ellen Noble

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2023, I electronically filed the foregoing amicus brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Dated: November 7, 2023

/s/ Ellen Noble
Ellen Noble

*Counsel for Amici Curiae*